**THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| JOCELYN A. ORIO,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DAL GLOBAL SERVICES, LLC,<br><br>                    Defendant. | CIVIL CASE NO. 14-00023<br><br><br>**DECISION AND ORDER RE<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT** |

Before the court is Defendant DAL Global Services, LLC's ("DGS") Motion for Summary Judgment. Mot. Summ. J., ECF No. 26. On May 4, 2016, the parties appeared before the court for a hearing. After reviewing the parties' submissions, and relevant caselaw and authority, and having heard argument from counsel on the matter, the court hereby **GRANTS** Defendant's Motion for Summary Judgment, for the reasons stated herein.

## I.     CASE OVERVIEW

This action was brought pursuant to 42 U.S.C. § 2000e *et seq.*, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 12101 *et seq.*, the Americans with Disabilities Act of 1990. Compl. ¶ 2, ECF No. 1. Plaintiff Jocelyn A. Orio ("Orio") seeks general damages as proven, as well as punitive damages and attorneys' fees and costs. *Id.* at 7.

1

### A. Procedural Background

On December 24, 2014, Orio filed the Complaint in this matter, alleging "employment discrimination retaliation" by DGS against her under Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990. Compl. ¶ 2, ECF No. 1. Specifically, Orio alleges that DGS discriminated against her in a manner that deprived her of equal opportunity "because of her national origin (Filipino), race (Asian), gender (female), disability (low back and knee pain and deterioration)," and retaliation against her because she "engaged in protective activity when she complained to her DGS employers about such discrimination." *Id.* ¶ 7.

On February 19, 2015, DGS filed an Answer denying liability for all claims. *See* Answer, ECF No. 4. On January 6, 2016, DGS moved for Summary Judgment on all claims. *See* Mot. Summ. J., ECF No. 26.

### B. Factual Background

Orio is a female United States citizen of Filipino descent in her mid-fifties, who at all relevant times herein resided in Guam. Compl. ¶ 4, ECF No. 1. DGS is a limited liability company whose sole member is Delta Air Lines, Inc., a Delaware corporation with its principal place of business in Georgia. *Id.* ¶ 5.

In spring of 2011, Derek Chaparro, a supervisor for DGS, interviewed Orio for the position of cabin/ramp agent at DGS. Chaparro Decl. ¶ 3, ECF No. 27-1. Ramp agent duties include loading luggage onto airliners and cabin agent duties include cleaning and preparing airliner cabins for flights." Compl. ¶ 9, ECF No. 1. During the interview, Chaparro claims that he informed Orio of the job requirement to lift up to seventy pounds on a frequent basis, while Orio claims she was informed that the lifting requirement was fifty pounds. Chaparro Decl. ¶ 3; ECF No. 27-1 at 7; Orio Ex. 3 (Orio Deposition), ECF No. 29-5 at 40 ("Orio Dep.").

2

Orio began working for DGS as a cabin/ramp agent on or about April 19, 2011. Compl. ¶ 8, ECF. No. 1. Sometime prior to August 2011, Orio notified DGS that she could not carry a vacuum pack on her back due to its weight. Orio Dep. at 62–63; *See* DGS Ex. J (Doctor's Note, Aug. 26, 2011), ECF No. 27-3. DGS asked Orio to obtain a doctor's note when she complained that she could not wear the backpack because that equipment was ordinarily used by the cabin/ramp agents as part of their duties. Orio Dep. at 62–63. On or about August 26, 2011, Orio provided DGS with a doctor's note stating that Orio could not lift over twenty-five pounds[1] due to "chronic low back pain." DGS Ex. J (Aug. 26, 2011, Doctor's Note), ECF No. 27-3.

Upon receiving the doctor's note, Glenn Weber, Station Manager for DGS' Guam location, put the note in her personnel file. Weber Decl. ¶¶ 2, 18–19, ECF No. 27-1 at 1 ("Weber Decl."). Weber weighed the vacuum used by Orio, and claims it weighed less than fifteen pounds. Weber Decl. ¶¶ 18–19. After being placed on "light-duty" by her physician, which restricted her from lifting over twenty-five lbs.,[2] Orio claims that she was then "permitted to continue performing her duties at DGS with certain accommodations such as . . . swap[ping] heavy-lifting duties with other employees, and vacuuming the airliner cabins while side-carrying rather than wearing the vacuum backpack." Compl. ¶ 10, ECF No. 1. DGS denies that Orio either asked for, or was given, any accommodation to swap out vacuuming duties with other personnel. *See* Orio Ex. 9 (DGS Resp. Interrog.), ECF No. 29-11.

### 1. The alleged sex, race, and nationality discrimination.

Beginning in September of 2011, Orio had multiple incidents with DGS employee George Cruz ("Cruz"). Cruz was employed with DGS as a "lead agent." Weber Decl. ¶ 12. A

---

[1] Orio has also supplied the court with another doctor's note, which is also from August 26, 2011, but states that she cannot lift over thirty pounds (instead of twenty-five pounds) and requires "light duty." Orio Ex. 2, ECF No. 29-4. However, DGS states that it never received the second doctor's note, and Orio states that she does not recall which note she gave to DGS. *See* Orio Dep. at 104–05.

[2] The Complaint references the thirty pound rather than twenty-five pound restriction. *See* Compl. ¶ 10, ECF No. 1.

3

"lead agent" is expected to rotate individual cleaning assignments for the purposes of avoiding injuries due to repetitive movements, "[c]oordinate with team members to stock vehicle with all supplies needed," set the example for their team, and assist others when needed. DGS Ex. F (Job Description), ECF No. 27-2 at 50.

In an incident in September 2011 when Cruz and Orio were changing the airplane's pillow cases, Cruz allegedly threw or hit her face with a pillow on three separate occasions while laughing. Orio Dep. at 80–82; Compl. ¶ 11, ECF No. 1. On the third time, she told him to "stop it," and he stopped. Orio Dep. at 82. This incident occurred during the day shift in front of at least one other employee. *Id.* at 82–83. In another incident in or around October, Cruz walked by Orio when they were waiting for a plane to arrive and said to her, "I don't know why they hired you." *Id.* at 85; Compl. ¶ 12, ECF No. 1.

A third incident also occurred sometime between September and November 2011 while Orio was cleaning tables in the passenger seats of the plane during the nightshift. Orio Dep. at 85-87. Cruz showed Orio a tray table she had already cleaned, and because he was not satisfied with the cleaning asked her, "is that how you clean your punket?" *Id.* at 85–86. Orio's coworker "Keith" was simultaneously reprimanded for his own inadequate cleaning skills when Cruz asked him: "[i]s this how you clean your balls?" Orio Dep. at 101. Orio did not know what that word "punket" meant, and did not respond. *Id.* at 86. A coworker who witnessed the encounter, Matthew Quenga, told her that "punket" was slang for "vagina." *Id.* Orio became upset upon learning this. *Id.*

A fourth incident occurred during the day shift on November 5, 2011, when Orio's coworker asked for a blanket to restock the airplane. *Id.* at 87-89. Cruz threw the blanket and it hit Orio in the back. *Id.* at 87-89. After Orio told him "[y]ou better watch out," he responded

Case 1:14-cv-00023   Document 44   Filed 09/26/16   Page 4 of 39

with: "Oh yeah? Yeah? What? What?" *Id.* at 88.  Two employees, "Rebekah" and "Normay" witnessed this exchange.  *Id.*

On November 7, 2011, Orio gave Chaparro a letter reporting the incidents with Cruz.[3] *Id.* at 90; *see also* DGS Ex. G (Letter, Nov. 7, 2011), ECF No. 27-2 at 53.  The letter asserts that Cruz harassed and discriminated against her "because [she is] a weak female [who] has no means of fighting back. Likewise, because of [her] race being a Pilipino [sic] race."  DGS Ex. G (Letter, Nov. 7, 2011), ECF No. 27-2 at 53.  When she handed this letter to Chaparro, Orio alleges that he told her that he would not fire Cruz, but might fire her instead.  Compl. ¶ 15, ECF. No. 1.[4]

Although not mentioned in the letter, it appears that in the fall of 2011, Cruz also used the word "mamasan" to refer to Orio on at least two occasions.[5]  *See* Compl. ¶ 13, ECF No. 1; Answer ¶ 13, ECF No. 4.  Orio contends that in Guam, the term "mamasan" commonly refers to older Asian women who work in brothels or nightclubs.  Compl. ¶ 13, ECF No. 1.

In response to Orio's November 2011 letter, Weber conducted an investigation on behalf of DGS as required by the company's anti-discrimination and anti-harassment policies.  Orio Dep. at 94–95; Weber Decl. ¶ 15.  Weber interviewed and took statements from employees, including Cruz.  Orio Dep. at 94–95; Weber Decl. ¶ 15.  Although Weber states he "could not substantiate most of Orio's allegations," he issued a counseling form to Cruz on December 14,

---

[3] In the letter, Orio mentions the incident with the blanket hitting her back, the incident in the warehouse when Cruz threw a pillow at her face repeatedly, another incident when "we were seated at the cleaning cart, waiting for the plane" when he "started insulting me, and verbally abuses me in front of our group," and a fourth incident, when Orio was inside the plane and Cruz "again started insulting me, saying bad words and was just so hostile to me."  DGS Ex. G (Letter), ECF No. 27-2 at 53.

[4] DGS admits that Chaparro said this to Orio, but that Chaparro said he would not take action against Cruz "because he did not have authority to issue any such action against Mr. Cruz at that time."  Orio Ex. 7 (DGS Amended Response to Request for Admissions), ECF No. 29-9 at 3–4.  DGS also states that Chaparro told Orio that he might take an action adverse to her "for reasons unrelated to the allegations raised in her letter."  *Id.*

[5] Coworker Jackquin Chargualaf stated that Cruz called Orio "mamasan" during a job shift on October 16, 2011. *See* Orio Ex. 8 (Statement of Jackquin Chargualaf), ECF No. 29-8.  She said that Orio "did not like that remark."  *Id.*  Coworker Matthew Quenga stated that Cruz called "Joy" (in reference to Orio) "mamasan" on an unspecified date, and that he had to explain to her what the term meant because she did not know.  DGS Ex. H (Statement of Matthew Quenga), ECF No. 27-2 at 55.

5

2011. Weber Decl. ¶ 16; Orio Ex. 5 (Counseling Form, Dec. 14, 2011), ECF No. 29-7. The form states that Cruz was counseled regarding his alleged use of the phrase "mamasan" in a manner "not of respect." Orio Ex. 5 (Counseling Form), ECF No. 29-7. Additionally, the form indicates that Cruz must "be careful how he speaks to subordinates." *Id.*

Weber met with Orio to tell her that DGS's investigation had concluded, but was not given details because the investigation was "confidential." Orio Dep. at 93–95. During Orio's deposition, she stated there were no incidents with Cruz following the November 7, 2011 letter. *Id.* at 97-98. Orio's Complaint, however, contends that Weber failed to separate her from Cruz, leaving her to work her shifts with Cruz, "who would tell [her] to quit her job because he knew her complaints would be in vain." Compl. ¶ 17, ECF No. 1. In November 2011, Weber granted Orio's request to switch to the graveyard shift to avoid any further confrontation with Cruz. Orio Dep. at 59–60, 150–52.

On December 22, 2011, Plaintiff filed EEOC Charge of Discrimination No. 846-2012-16908 with Guam's Department of Labor. Compl. ¶ 16, ECF No. 1; *see also* DGS Reply Ex. Q (EEOC Charge), ECF No. 33-2. In the Charge, Orio stated she was "subjected to harassment and sexual harassment" by Cruz, and listed the incidents where he (1) "threw a pillow at [her] face three times, (2) "threw something (maybe a blanket) at her back," and (3) "one time while [she] was cleaning tray tables, he said 'hey Jocelyn, is that how you clean your punket?'" DGS Reply Ex. Q (EEOC Charge), ECF No. 33-2. The Charge also states that Cruz had insulted and verbally harassed her, and specifically alleges discrimination based on sex (female), race (Asian), and national origin (Filipino). *Id.*

### 2. Disability discrimination and retaliation.

In April of 2012, Orio provided two additional doctor's notes to Weber indicating "light duty" was needed for a period of thirty days. Weber Decl. ¶ 20; *see also* DGS Ex. K (Doctor's

6

Note, Apr. 18, 2012), ECF No. 27-3 at 6. Upon receipt of these doctors' notes on April 12, 2012, DGS placed Orio on transitional duty as required by DGS's policy. Weber Decl. ¶ 21. Transitional duties at DGS "include[] security search, cleaning the aircraft cabin, lavatory, and galley, and warehouse and office duties." *Id.*

Orio contends that after DGS management received these doctors' notes, she was excessively assigned to vacuum duties in April and May of 2012. Compl. ¶ 21, ECF No. 1. Orio also asserts that during this time she was assigned to clean the airplane lavatories, but previously, she had never seen a woman assigned to that duty—only men. *Id.* ¶ 20; Orio Dep. at 155–56. Additionally, Orio maintains that Cruz forbade her from swapping the vacuum and lavatory duties with willing coworkers "who were themselves permitted to swap such duties." Compl. ¶ 22, ECF No. 1. Specifically, on May 6, 2012, Orio was assigned the task of examining the overhead bins of the plane with a mirror for two days in a row. *Id.* ¶ 23; Orio Dep. at 129. Because these areas are hard to reach, a taller employee, Hilton Ngirdmadu, offered to trade assignments. *Id.* ¶ 23; Orio Dep. at 129. The team leader, Pauline Pocaique, approved the swap, but Orio stated that before they swapped, her coworker "Gloria" said Orio could not swap with Hilton because "George [Cruz] is mad." *Id.*

Orio's transitional duty ended on May 11, 2012, because DGS policy only permits transitional duty for a period of thirty days. Orio Dep. at 115; DGS Ex. D (DGS Employee Handbook), ECF No. 27-2 at 44. On or about May 8, 2012, Orio and Weber discussed expiration of Orio's light duty period. Orio Dep. at 129–30. Orio does not recall if Weber told her that she could apply for FMLA leave, or a personal leave of absence. *Id.* at 130. On May 9, 2012, Orio received another doctor's note prescribing "light duty" from May 12, 2012 until June 12, 2012. *See* Orio Ex. 11 (Doctor's Note, May 9, 2012), ECF No. 29-13.

7

The parties dispute what transpired upon expiration of the transitional duty period. According to Chaparro, he called Orio on May 11, 2012, to inform her that her transitional duty ended and that she would need to apply for other types of leave if she wanted to continue her employment with DGS. Chaparro Decl. ¶ 6. Chaparro claims he told Orio that if she applied for leave, "[DGS] would need to hold on to her badge until she return[ed] back to work." Orio Ex. 18 (Chaparro's Response to Allegations), ECF No. 29-20.[6]

Conversely, Orio maintains that when Chaparro called her on May 11, 2012, he did not mention the availability of FMLA or personal leave, told her she could not return to work and that she must turn in her badge. Orio Dep. at 109-10, 116. After this conversation, Orio claims she believed she was terminated. *Id.* at 110–11.

After May 11, 2012, Orio did not report for work. Weber Decl. ¶ 23. She also did not call Weber, Chaparro, or DGS's Human Resources Department. Orio Dep. at 115–16. Weber asserts that on May 17, 18, 22, 23 and 25 of 2012, he called Orio's home phone and left messages on her voicemail, but she did not return his calls. Weber Decl. ¶ 23. At Orio's deposition, she stated that she never received any calls or messages from DGS at her home, but also that she did not listen to her voicemail messages and does not know if DGS left her a message. Orio Dep. at 112. She supplied sworn declarations in which all members of her household (three sons and her husband) state that they never received a call from DGS for Orio.[7]

---

[6] Weber's recommendation for Orio's termination of employment indicates that after the May 11, 2012 phone call in which she was advised of the end of transitional duty, he called Orio several times from May 17 through May 25, left three voicemails and two messages with Orio's son, but she did not call back. *Id.* DGS Ex. M (Recommendation for Termination of Employment), ECF No. 27-3 at 11.

[7] *See* Orio Ex. 12 (affidavit of Rogelio L. Orio (husband)); Orio Ex. 13 (affidavit of Sam Christopher Asiatico Miclat (son)); Orio Ex. 14 (affidavit of Rogelio Joseph Orio (son)); Orio Ex. 15 (affidavit of Guafil Orio (son)). DGS asserts that this evidence is inadmissible because Orio did not disclose any of her sons as witnesses in this case, meaning that their disclosure as witnesses is untimely under Rule 26, and their affidavits must be disregarded pursuant to FED. R. CIV. P. 37(c). Reply at 13-14, ECF No. 33. However, even if Orio failed to follow Rule 26, Rule 37 does not apply if the failure was "substantially justified or is harmless." FED. R. CIV. P. 37(c). In this case, any failure to identify the witnesses is harmless because Orio identified them in her deposition as living with her at her home, and answering the phone. Orio Dep. at 112. Further, DGS's own documentation states that

8

However, none of them mention checking the voicemail machine. Orio Exs. 12-15, ECF Nos. 14-17.

On May 21, 2012, "DGS received Orio's airport ID badge from an agent of another company at the airport." Weber Decl. ¶ 24. Orio had asked her friend, who is an employee for "ASIG," to return Orio's badge to the Delta Office. Orio Dep. at 34-35, 108. For security reasons, DGS employees should not give their badge to any other individual and must turn it into DGS at the end of employment.[8] Weber Decl. ¶ 24. Weber stated that "failure to abide by these conditions makes a DGS employee subject to termination." *Id.*

DGS asserts that "[a]s a result of Orio's failure to report to work, notify DGS of her absences, or return any messages left for her, DGS considered her to have abandoned her employment." Weber Decl. ¶ 25; *see also* DGS Ex. M (Recommendation for Termination of Employment), ECF No. 27-3 at 11. Weber recommended to DGS that Orio be terminated on May 29, 2012 because "Orio ha[d] failed to call or show any interest in the company" and "having someone return her badge is not acceptable due to security reasons." *See* DGS Ex. M (Recommendation for Termination of Employment), ECF No. 27-3 at 11.

---

Weber alleges he left two voicemails with Orio's "son." DGS Ex. M (Recommendation for Termination of Employment), ECF No. 27-3 at 11. Therefore, DGS was aware that these sons potentially possessed information, and it is harmless error for Orio to have not identified them as witnesses.

[8] Orio supplied the court with her application for a Transportation Security Administration ("TSA") badge, in which the "Applicant's Certification," paragraph 3 states that "[m]y ID Badge cannot be transferred to another individual or used for any purpose by another individual." Orio Ex. 16, ECF No. 29-18. Paragraph 13 states:

> The ID Badge must be returned to the employer at the end of my employment. The Identification Badge may also be returned to the RACCS ID Section located at the Airport Police Administration Office. The ID Section will issue a receipt to me as proof that the ID Badge was returned.

*Id.* at 5. The application was signed by Orio on December 20, 2011. *Id.*

9

On May 16, 2012, Plaintiff submitted a second EEOC complaint with the EEOC, this time adding the claims of retaliation and disability discrimination. Compl. ¶ 26, ECF No. 1.[9] In this second Charge of Discrimination, Orio stated that since filing the first Charge, she was harassed by Cruz and also Chaparro, who called her a "snitch." *See* DGS Ex. L (Second EEOC Charge), ECF No. 27-3 at 8. She additionally alleged that she was forced to work shifts with Cruz, and that DGS, despite being aware of her disability was "mandating that [she] wear the vacuum cleaner pack and [would] not allow [her] to switch out this duty with other personnel" even though it previously granted her requests for reasonable accommodations. *Id.* Orio further claimed that on May 11, 2012, Chaparro "contacted [her] and informed [her] that an employee could only have a thirty-day medical certificate, and that [she] needed to turn in her badge." *Id.*

"On or about September 30, 2014, Plaintiff received a Notice of Right to Sue letter from the EEOC for EEOC Charge No. 486-2012-00284." Compl. ¶ 27, ECF No. 1. This action followed.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A shifting burden of proof governs motions for summary judgment under Rule 56. *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment bears the initial burden of proving an absence of a genuine issue of material fact. *Id.*

[9] In the Complaint, Orio asserts that the Charge also included a claim of wrongful termination. This claim, however, is not evident from the Charge.

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Where, as here, the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the movant meets its burden, the burden then shifts to the nonmoving party to set forth "specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 250. "The mere existence of a scintilla of evidence . . . will be insufficient" and the nonmoving party must do more than simply show that there is "some metaphysical doubt as to the material facts." *Id.* at 261; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Viewing the evidence in the light most favorable to the nonmoving party, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## III.    DISCUSSION

DGS contends that the court should grant summary judgment against Orio on all claims "[b]ecause there are no issues of fact supporting liability against DGS for discrimination or retaliation, or supporting a punitive damages award against DGS."  Mot. Summ. J. at 2, ECF No. 26.  Orio, on the other hand, maintains that DGS took her deposition testimony out of context and preyed upon "her poor command of the English language and lack of sophistication."  Opp'n at 1, ECF 29.  She urges that without DGS's mischaracterizations, her complete testimony and sworn affidavits presented in opposition to the Motion for Summary Judgment present factual issues for trial.  *Id.*  In response, DGS asserts that Orio's Affidavit in Opposition to its Motion for Summary Judgment is a "sham affidavit" because the facts within it contradict or differ from the testimony she provided DGS during her deposition.  Reply at 1, ECF No. 33.

11

The court will first address the admissibility of Orio's deposition answers and affidavit submitted in Opposition to the Motion for Summary Judgment. Next, the court will examine whether summary judgment is proper for (1) Orio's Title VII Gender, Race and National Origin Discrimination claims; (2) Orio's disability discrimination claim; and (3) retaliation claims. Finally, the court will determine whether Orio may seek punitive damages for any of her claims.

**A.      Orio's Deposition Answers and Affidavit in Support of Her Opposition Brief.**

Orio submitted an affidavit in support of her Opposition that clarifies and in some instances contradicts her deposition testimony. *See* Orio Ex. 1 (Orio Aff.), ECF No. 29-1. In her view, material facts remain in dispute because she "often gave answers showing that she didn't actually understand the questions," and because she never signed the deposition transcripts. Opp'n at 4-5, ECF No. 29 (citing Orio Ex. 1 ¶¶ 50-52; Orio Dep. at 167). In response, DGS contends that portions of Orio's affidavit which contradict or differ from her deposition testimony "amount to a sham affidavit." Reply at 1-2, ECF No. 33. Accordingly, DGS requests this court to strike "any corrections, clarifications, or contradictions to her testimony because she failed to present that information properly under [FRCP] 30(e)." *Id.*

The sham affidavit rule in the Ninth Circuit states that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citations omitted). The purpose of this rule is to "prevent[] 'a party who has been examined at length on deposition' from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which 'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Id.* (second alteration in original) (quoting *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991)). A district court must determine whether the "contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and

12

unambiguous to justify striking the affidavit." *Id.* (citation omitted). A declaration is a sham if "no juror would believe [plaintiff]'s weak explanation for his sudden ability to remember" or clarify the answers to important questions about the critical issues of his lawsuit, particularly in light of the number of exhibits used during the deposition to refresh his recollection. *See id.* at 1081.

The Ninth Circuit has cautioned, however, that "newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." *Id.* at 1081 (citation omitted). By its nature, "the sham affidavit rule is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). When a district court aggressively invokes the rule, it "threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Id.* Thus, Orio is not precluded from "elaborating upon, explaining or clarifying prior testimony" from her deposition and "minor inconsistencies that result from an honest discrepancy, [or] a mistake," or newly discovered evidence. *See Yeager*, 693 F.3d at 1080 (citation omitted).

Clarifications, elaborations, and/or contradictions between Orio's affidavit and her deposition testimony include: (1) that Cruz publicly called Orio "mamasan" at least five times (¶ 23); (2) that Cruz "puff[ed] his chest and flex[ed] his arms like a threat" in the incident in which Cruz hit Orio with a blanket (¶ 27); (3) that Orio was never trained to clean out the airplane lavatories (¶ 36); and (4) that DGS never left messages at her home after the May 11, 2012 phone call from Chaparro (¶ 48). *See* Orio Ex. 1 (Orio Aff.), ECF No. 29-3. On a related note, DGS contends that the doctor's note Orio submitted as Exhibit 2 is not properly authenticated, and contradicts her deposition testimony. Reply at 10, ECF No. 10.

13

DGS objects to Orio's claim that Cruz called her "mamasan" five times, arguing that Orio did not reference these statements when asked to list her complaints about Cruz during her deposition, and that neither her EEOC Charge nor her November 7, 2011, letter reference the "mamasan" comments. Reply at 8-9, ECG No. 33 (citing DGS Ex. G (Nov. 7, 2011, Letter); ECF No. 27-2, Ex. Q (Jan 23, 2012 EEOC Charge), ECF No. 33-2; Orio Dep. at 78-90. Yet, Orio explicitly mentions the "mamasan" incident in ¶ 13 of her Complaint, and DGS admits Cruz used the word in its Answer. *See* Compl. ¶ 13, ECF No. 1; Ans. ¶ 13, ECF No. 4. Additionally, Orio's coworkers corroborated Cruz's "mamasan" comments. *See* Orio Ex. 6 (Statement of Jackquin Chargualaf), ECF No. 29-8; DGS Ex. H (Statement of Matthew Quenga), ECF No. 27-2 at 55.

Furthermore, Orio discusses Cruz's use of the term "mamasan" in her deposition. *See* Orio Dep. at 100,[10] 133 (DGS's counsel questioned Orio regarding how the use of "Mama-San" related to her disability discrimination claim, but Orio was unsure). From the context, Orio was merely "confused" regarding the legal application of her individual Title VII claims to the particular incidents, such as the "mamasan" comment. *See Yeager*, 693 F.3d at 1080 (citation omitted).[11] There is no indication that DGS ever asked Orio how many times the term was used during discovery. Thus, the court concludes Orio's reference to the five separate "mamasan" comments in ¶ 23 of her Affidavit is a permissible elaboration, clarification, or honest mistake to

---

[10] "Q Has anyone called you Mama-San? Have you heard anybody call you Mama-San? A . . . "[Cruz] himself. He's calling me Mama-San. Orio Dep. at 100.

[11] Similarly, this court is not persuaded that the scope of Orio's ADA claim is limited to the three specific events she testified to during her deposition. Reply at 4, ECF No. 33. Viewed in context, Orio was confused regarding the legal application of her individual Title VII claims to the particular incidents. *See* Orio Dep. at 132. Aggressively invoking the sham affidavit rule under these circumstances would "threaten[] to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Van Asdale*, 577 F.3d at 998.

the extent that it differs from her deposition testimony. *See Yeager*, 693 F.3d at 1080 (citation omitted).

Similarly, Orio's Affidavit permissibly expounds upon the incident in which Cruz hit Orio with the blanket, adding that Cruz "puff[ed] his chest and flex[ed] his arms like a threat." *See* Orio Ex. 1 (Orio Aff.), ECF No. 29-3. Although Orio does not describe this body movement accompanying Cruz's statement -- "Oh yeah? Yeah? What? What?" -- in response to Orio's warning that he "better watch out," the court concludes this elaborative fact is allowable and not contradictory. *See Yeager*, 693 F.3d at 1080 (citation omitted); *see also* Orio Dep. at 88. Hence, the court will not strike ¶ 27 of Orio's Affidavit.

Likewise, the court will not strike ¶ 36 of Orio's Affidavit, in which Orio claims she was never trained to clean out the airplane lavatories. Although DGS has presented evidence that: (1) Orio "receive[d] training to perform [her] duties;" (2) that Orio's training record reflects training on "lavatory/Water Service Truck," "portable water servicing procedures," and lavatory servicing procedures for every aircraft DGS services; and (3) that "servicing aircraft lavatories" and "cleaning aircraft are explicit duties for a cabin/ramp agent," the sham affidavit rule is not implicated. *See* DGS Ex. R (Course Code), ECF No. 33-3; DGS Ex. S (DGS Lavatory Servicing Procedures), ECF No. 33-4; Orio Dep. at 46. Orio never specifically testified that she was trained in lavatory servicing, only that she had generally been trained to perform her duties. *See* Orio Dep. at 46. Therefore, ¶ 36 of Orio's Affidavit will not be stricken because it does not contradict her prior deposition testimony.

On the other hand, ¶ 48 of Orio's Affidavit stating that DGS never left messages at her home after the May 11, 2012, phone call from Chaparro, improperly contradicts her deposition testimony that she did not listen to her messages. *See* Orio Ex. 1 (Orio Aff.), ECF No. 29-3; *see*

*also* Orio Dep. at 112;[12] Reply at 13-14, ECF No. 33. Thus, ¶ 48 of Orio's Affidavit is stricken, as are portions of the Opposition that reference this paragraph.

DGS's contention that the August 26, 2011, doctor's note placing her on "light duty" is not properly authenticated is also problematic. Reply at 10, ECF No. 33; Orio Ex. 2 (Doctor's Note, Aug. 26, 2011), ECF No. 29-4. Documents attached to an affidavit in a summary judgment motion must be authenticated through personal knowledge, and "the affiant must be a person through whom the exhibits could be admitted into evidence." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773–74 (9th Cir. 2002) (footnote and citations omitted). Orio's Affidavit does not authenticate the exhibit. *See* Orio Ex. 1 (Orio Aff.), ECF No. 29-3. Rather, Orio's counsel purports to authenticate the document. *See* Bell Decl. ¶¶ 2, 4, ECF No. 29-2. Orio's counsel, however, does not have personal knowledge and is not "a person through whom the exhibits could be admitted into evidence." *See Orr*, 285 F.3d at 773–74 (footnote and citations omitted). Thus, the August 26, 2011 doctor's note is stricken.

Even though Exhibit 2 is stricken as not properly authenticated, the court disagrees with DGS that Orio's statement that she knew of DGS's thirty-day transitional duty policy contradicts her assertion that she does not recall being told she was on temporary light duty immediately preceding the end of her employment. *See* Reply at 10-11, ECF No. 33; *see also* Orio Ex. 1

---

[12] Orio testified during her deposition as follows:

Q Did you ever listen to your messages?

A No, sir.

Q You did not listen to your messages?

A No, sir.

Q So you don't know if DGS left you a message for you to call wondering why you had not reported to work?

A Yes, sir.

Orio Dep. at 112

16

(Orio Aff.) ¶ 45, ECF No. 29-3; Orio Dep. at 103. Accordingly, ¶ 45 of Orio's Affidavit will not be stricken because it does not contradict her prior deposition testimony.

Having addressed DGS's objections to Orio's proffered evidence, the court will now consider whether there are genuine issues of material fact regarding her Title VII claims.

### B. Orio's Claims for Sex, Race, and National Origin Discrimination.

DGS argues this court should grant their motion for summary judgment against Orio's claims of discrimination based on sex, race, and national origin because, in their view, the purported harassment was not based on a protected class, the alleged conduct was not sufficiently severe and pervasive, and because DGS took remedial action against Cruz. Mot. Summ. J. at 13, 15, ECF No. 26. In response, Orio maintains that Cruz's "mamasan" and "punket" relate to her gender and national original. Opp'n at 14, ECF No. 29. When viewed in context, she believes these incidents give rise to an actionable claim for discrimination based on sex, race, and national origin. *See id.* at 14-16. Additionally, she contends that DGS failed to take adequate and appropriate remedial action, thus exposing it to liability. *Id.*

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). This provision prohibits (1) "discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts," and (2) "the creation or perpetuation of a discriminatory work environment." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2440 (2013); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986) (holding that a claim of "hostile environment" sex discrimination is actionable under Title VII.). In this case, Orio is asserting claims under Title VII under a hostile work environment theory.

17

### 1. Elements of sex, race, and national origin hostile work environment claims.

In order to survive summary judgment on the claim of a hostile work environment based on sex, race, or national origin, Orio must show the existence of a genuine factual dispute: "(1) that [s]he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (footnote omitted). Cases analyzing hostile work environment claims for both racial and sexual harassment are relevant to our analysis because the elements for each are the same. *Id.*

In addition to showing that a reasonable Asian or Filipina woman would find the workplace objectively and subjectively hostile, Orio must also show that DGS failed to take adequate remedial and disciplinary action to survive summary judgment. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (citations omitted). Each element will be addressed in turn.

### a. Verbal conduct of a sexual nature that was unwelcome.

To be actionable based upon gender discrimination, verbal or physical "conduct of a sexual nature is something more like outright sexual harassment, consisting in actions related to sexual attraction, and derogatory, abusive language directed at women because they are women." *Sablan v. A.B. Won Pat Int'l Airport Auth., Guam*, No. CIV. 10-00013, 2010 WL 5148202, at *8 (D. Guam Dec. 9, 2010) (citing *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 964, 966-68 (9th Cir.2002) (Genuine issues of material fact existed for Title VII hostile work environment claim where plaintiff was raped three times in one night by a business associate whose actions were essentially condoned by the employer.); *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1105-06, 1108-09 (9th Cir. 1998) (Genuine issue of material fact as to whether alleged hostile

work environment continued into relevant limitations period existed in case involving an employee who made sexual remarks to a female co-worker over the loudspeakers at work and commented about her body to male co-workers.); *Fuller v. City of Oakland, Cal.,* 47 F.3d 1522, 1527-28 (9th Cir.1995) (Summary judgment for the defendant city was reversed where plaintiff's ex-boyfriend was repeatedly calling her house and hanging up, threatening to kill himself, running her off the road and getting her unlisted number because this behavior constituted an actionable claim under Title VII); 9th Cir. Model Civ. Jury Instr. 10.2A (Elements of Harassment in Title VII Hostile Work Environment cases).

DGS argues that Cruz's use of the word "punket" does not rise to the level of being sexual in nature because it is a statement that merely implicates gender, which does "not qualify as 'conduct of a sexual nature'" under *Sablan*. Mot. Summ. J. at 13, ECF No. 26 (citing 2010 WL 5148202, at *8). Instead of using the term "punket" to express sexual attraction or a sexual act, DGS asserts the term was used to express dissatisfaction with her cleaning skills. *Id.* at 14, Reply at 7, ECF No. 33. They buttress this argument by pointing out that Orio's coworker "Keith" was simultaneously reprimanded for his own inadequate cleaning skills when Cruz asked him: "[i]s this how you clean your balls?" Orio Dep. at 101. Orio counters that "[t]he word is . . . obviously sexual and inappropriate in polite society." Opp'n at 14, ECF No. 29.

Even though the remark was unwelcome, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discriminat [ion]* . . . because of . . . sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (alteration in original) (citation omitted). The United States Supreme Court has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* Instead, "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous

19

terms or conditions of employment to which members of the other sex are not exposed." *Id.*
(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J. concurring)).

Even though Orio was upset upon learning what the term meant, she has not demonstrated that she was exposed to a disadvantageous condition of employment that men were not exposed. This is because both male and female employees were exposed to crass comments referencing sexual organs with respect to their cleaning skills. Thus, her claim for gender discrimination fails with respect to the "punket" comment.

### a. Verbal conduct of a racial nature that was unwelcome.

Orio has shown that Cruz's use of the term "mamasan" is unwelcome verbal conduct of a racial nature that was unwelcome. The term is often used to describe "older asian women who work in brothels or nightclubs of ill repute." *See* Comp. ¶ 13, *see also* ECF No. 1, Orio Ex. 1 (Orio Aff.) ¶ 23, ECF No. 29-3; Orio Dep. at 133. Thus, the first and second elements of Title VII claim based on race or national origin are satisfied.

### b. Sufficiently severe or pervasive conduct that alters the conditions of employment and creates an abuse work environment.

To satisfy the third element, Orio must show that the work environment is "both subjectively and objectively abusive."[13] *Little*, 301 F.3d at 966. Whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)); *see also Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)). The requisite level of severity is inversely related to the frequency or pervasiveness of the

---

[13] "The objective portion of the claim is evaluated from the reasonable woman's perspective." *Little*, 301 F.3d at 966.

conduct at issue. *Nichols*, 256 F.3d at 872. Accordingly, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citation omitted).[14]

Recognizing that Title VII is not a "general civility code," the Ninth Circuit has affirmed summary judgment in cases involving occasional racially motivated comments. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 798-99 (9th Cir. 2003). In *Manatt*, there were two "regrettable" racist teasing incidents related to plaintiff's Chinese heritage that occurred over a span of two-and-a-half years. *Id.* The plaintiff was ridiculed by coworkers for mispronouncing "Lima," and once, when upon seeing her, coworkers "pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians." *Id.* at 798. Even when these racially charged comments coupled with other offhand remarks made by plaintiff's coworkers and supervisor, including jokes using the phrase "China man" and references to China and communism, the court reasoned that this did not alter the conditions of her employment and objectively cause a hostile work environment, even if these events caused her to "suffer pain." *Id.* at 798-99 (footnote and citations omitted). The court held that "[i]f these actions had occurred repeatedly, then plaintiff may have had an actionable hostile environment claim." *Id.* (citation omitted).

Similarly, in *Vasquez v. County. of Los Angeles*, the Ninth Circuit upheld summary judgment on a Title VII hostile environment discrimination claim related to sex and race where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field in a manner that stereotyped Hispanics as lazy and unambitious, that he was "unqualified to work with minors because of his race and sex," and where he was yelled at in

---

[14] The Seventh Circuit has said that "'occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers' would be neither pervasive nor offensive enough to be actionable (citations). The workplace that is actionable is the one that is 'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)).

21

front of others. 349 F.3d 634, 643, 648 (9th Cir. 2003), *as amended* (Jan. 2, 2004). The court held that these incidents were not sufficiently severe or pervasive to constitute a hostile work environment, thus foreclosing a Title VII claim. *Id.* at 642.[15]

Additionally, in *Kortan v. California Youth Authority*, the Ninth Circuit upheld a grant of summary judgment where, in what was mostly a single incident, plaintiff's supervisor "referred to a former female superintendent as a "castrating bitch" or "madonna" or "regina," referred to women generally as "bitches" and "histrionics," made "racial remarks about blacks," and told plaintiff that she was a "Medea" rather than an "Artemis." 217 F.3d 1104, 1107, 1110 (9th Cir. 2000) (footnote and citations omitted). Although these comments were offensive, they were not sufficiently severe or pervasive to survive summary judgment. *Id.* at 1111.

Here, Orio has not shown that there are material facts in genuine dispute that the alleged sex, race, or national origin discrimination was sufficiently severe or pervasive. Cruz threw a pillow at her face, asked her if her cleaning of a tray table was how she cleaned her "punket," asked "why did they even hire you," threw a blanket at her back, and called her "mamasan" on a handful of occasions. Orio Dep. 80-82, 86-87; Compl. ¶¶ 11, 13; DGS Reply Ex. Q (EEOC Discrimination Charge), ECF No. 33-2. Cruz's "offhand" "punket" and "mamasan" comments and actions are tinged with sexual or racial implications and are certainly crude and offensive. Yet like *Manatt*, *Vasquez*, and *Kortan*, these incidents do not rise to the level of a hostile work environment based on sex, race, or nationality discrimination because they did not illustrate

---

[15] Actionable hostile wok environment claims involve severe and prolonged conduct. *See, e.g.*, *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir. 2002) (hostile work environment claim established where, during a two-year period on nearly a daily basis, plaintiff's supervisor and coworkers subjected him to whistling, caressing, hugging, blowing kisses, calling him "sweetheart" and "muñeca" (Spanish for "doll"), telling crude jokes and giving sexually oriented gifts, forcing him to look at pictures of naked men having sex, and on numerous occasions, grabbing his crotch and poking their fingers in his anus through his clothing); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114-15 (9th Cir. 2004) (hostile work environment established sufficient to survive summary judgment when plaintiff was involved in a serious automobile accident because, due to his race, both his supervisor and garage personnel did not maintain his vehicle, he was forced to work in dangerous situations, was called "nigger" and other names several times over a two-year period, and "white is right" was written in the bathroom).

22

conduct that was "severe and pervasive" sufficient to create an actionable abusive working environment under Title VII. *See Little*, 301 F.3d at 966.

### 2. Vicarious Liability of DGS for Cruz's Behavior.

Although the court has determined Cruz's conduct did not rise to the level of an actionable Title VII claim for sex, race, or national origin discrimination, the claim similarly fails because even if the elements were satisfied, DGS is not vicariously liable for his behavior under these circumstances.

This court must determine whether Cruz was Orio's supervisor, or merely a coworker because "[a]n employer's liability for harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker." *McGinest*, 360 F.3d at 1119 (citation omitted). If Cruz is a supervisor, DGS "is vicariously liable for a hostile environment created by a supervisor, although such liability is subject to an affirmative defense." *See id.* (citations omitted). However, if "the harasser is merely a coworker, the plaintiff must prove that . . . the employer knew or should have known of the harassment but did not take adequate steps to address it." *Id.* (alteration in original) (citation omitted).

### a. Cruz's status as a supervisor.

In cases in which the harasser is a "supervisor," the employer is strictly liable for the supervisor's harassment if it culminates in a tangible employment action. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 790 (1998). A "supervisor" is an employee who empowered to take "tangible employment actions," that result in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Id.* (citation omitted).

23

It is appropriate to hold the employer strictly liable "[w]hen a supervisor makes a tangible employment decision, [because] there is assurance the injury could not have been inflicted absent the agency relation." *Id.* (citation omitted). By their nature, "tangible employment decisions require[] an official act of the enterprise," that is often "documented in official company records, and may be subject to review by higher level supervisors." *Id.* (citation omitted).

If the supervisor's harassment does not involve "tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense." *Id.* (citations omitted). In particular, "an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Id.* (citations omitted).

An employee is a supervisor rather than merely a coworker when the employee has the power to take tangible actions that result in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (citation omitted). The United States Supreme Court has declined to extend the "open-ended approach advocated by the EEOC's Enforcement Guidance, which ties supervisor status to the ability to exercise significant direction over another's daily work." *Id.* (citations omitted). Instead, "supervisory status can usually be readily determined, generally by written documentation." *Id.* (citations omitted). The test to determine supervisory status "can be applied without undue difficulty at both the summary judgment stage and at trial." *Id.* at 2444 (citations omitted).

Here, Orio has failed to show that there is a genuine dispute of material fact as to whether Cruz was her supervisor. DGS's lead agent job description confers no authority to hire, fire,

24

discipline, or take other tangible employment action against the lead's team members. *See* Weber Aff. ¶ 13, ECF No. 27-1; *see also* DGS Ex. F (Job Description), ECF No. 27-2 at 51. It appears that Orio would have this court employ the "open-ended approach advocated by the EEOCs Enforcement Guidance, which ties supervisor status to the ability to exercise significant direction over another's daily work" that was rejected by the United States Supreme Court. *See Vance.*, 133 S. Ct. at 2443 (citations omitted).

When asked about the role of a lead agent, Orio contended they perform a "supervisory" role, but stated that their purpose is to "monitor" cabin/ramp agents work. Orio Dep. at 59. Yet when asked if lead agents can issue "discipline, warning letters, [and] final warning letters," she shook her head and replied, "I don't know." *Id.* Although Orio has demonstrated that Cruz had his own office, that he was a lead agent, and that on May 6, 2012, he did not allow her to switch her assigned duty with another coworker that was approved by another lead, she has failed to illustrate that he had any supervisory power as defined in *Vance.* *See* Orio Dep. at 79, 127-131. Refusing to permit a swap with another employee does not rise to the level of "reassignment with significantly different responsibilities" because performing mirror duties is within her job description and does not constitute a "significantly different" responsibility. *See Vance.*, 133 S. Ct. at 2443 (citations omitted). Consequently, the court finds that Cruz was not a "supervisor" for purposes of Title VII.[16]

Thus, even if Orio had set forth an actionable claim, which she has not, DGS would only be liable for Cruz's behavior if it was negligent in controlling work conditions via the creation of a hostile work environment. *Vance*, 133 S. Ct. at 2441. The employer acts negligently when it knows or should know of the harassment but fails to take steps "reasonably calculated to end the

---

[16] It appears from Orio's testimony that Chaparro was a supervisor and that Weber was a "Station Manager." Orio Dep. at 55-56.

harassment." *Dawson v. Entek Int'l*, 630 F.3d 928, 938 (9th Cir. 2011) (internal quotations omitted).

### b. Cruz's status as a coworker.

If Cruz was merely Orio's coworker, DGS will be liable if it "fail[ed] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest*, 360 F.3d at 1119–20 (citations omitted). Even where management-levels knew or should have known of the harassing conduct at issue, though, the employer "may nonetheless avoid liability for such harassment by undertaking remedial measures 'reasonably calculated to end the harassment.'" *Id.* at 1120 (citations omitted). Whether the remedy was reasonable depends upon whether it will "(1) 'stop harassment by the person who engaged in the harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *Id.* (quoting *Nichols,* 256 F.3d at 875); *see also Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (The reasonableness of the degree of corrective action must be a function of the severity of the alleged harassment and the evidence provided to the employer in support of the complaint.). An employer must intervene promptly for the remedy to be adequate. *Id.* (citation omitted). Furthermore, the "[r]emedial measures must include some form of disciplinary action, which must be 'proportionate[ ] to the seriousness of the offense." *Id.* (second alteration in original) (quoting *Ellison,* 924 F.2d at 882 ("Title VII requires more than a mere request to refrain from discriminatory conduct."); *see also Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1482 (9th Cir.1997).

In this case, DGS took immediate corrective action against Cruz after it received Orio's November 2011 letter complaining of his behavior. A conversation occurred between Weber, Cruz, and Orio, and Weber required Cruz to write a statement admitting to the "punket" incident. *See* Orio Ex. 4 (Aff. Mart Paraiso), ECF No. 29-6 at ¶¶ 12–13. DGS also counseled Cruz in

26

December 2011 for the use of the term "mamasan" in a manner "not of respect," and to be "careful how [he] speak[s] to subordinates."  *See* Orio Ex. 5 (Counseling Form), ECF No. 29-7.

During her deposition, Orio stated there were no additional incidents with Cruz after the November 7, 2011 letter.  Orio Dep. at 98–99.  In her Opposition, she clarifies that Cruz called her "a snitch," she was written up for being 10 minutes late, for wearing black stretch pants that were not proper uniform pants, that her request for a duty was overridden by Cruz after the November 7, 2011, letter.  Opp'n at 11-12, ECF No. 29 (citing Orio Ex. 1 ¶¶ 33, 43 (Orio Aff.), ECF No. 29-3; Orio Ex. 4 ¶ 9 (Aff. Paraiso), ECF No. 29-6; Orio Ex. 19 (Absence Slip, Feb. 24, 2012), ECF No. 29-21; Orio Ex. 20 (Counseling Form), ECF No. 29-22.  Yet what Orio omits in her Complaint and Opposition is that she was called "a snitch" in response to telling Weber that Cruz was smoking in the warehouse, not for reporting her encounters with Cruz.  Orio Dep. at 126.  The other incidents enumerated by Orio simply demonstrate deficiencies in her job performance rather than improper acts by Cruz.

Furthermore, although Orio contends that Weber failed to separate her from Cruz during the investigation, this is only a factor that must be considered in determining if DGS exercised reasonable care to promptly correct harassing behavior.  *See, e.g.*, *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1186 (9th Cir. 2005), *amended on denial of reh'g,* 433 F.3d 672 (9th Cir. 2006), *amended on denial of reh'g,* 436 F.3d 1050 (9th Cir. 2006).

Given the objectively non-severe nature of Orio's allegations, and the fact that Cruz was formally reprimanded with a conversation and a counseling form, the evidence is that DGS exercised reasonable care.  Therefore, even if Cruz's conduct was discriminatory, which this court has determined it is not, DGS took remedial action that alleviates it of liability for a Title VII claim for sex, race or nationality discrimination.

27

For these reasons, the court **GRANTS** summary judgment in favor of DGS on Orio's sex, race, and nationality discrimination claims.

## C.    Disability Discrimination Claim.

DGS asserts that it is entitled to summary judgment because Orio has not presented facts sufficient to support a hostile work environment claim based on disability discrimination because none of the alleged harassment related to a disability, the conduct at issue was not sufficiently severe or pervasive, and it is not vicariously liable for Cruz's conduct. Mot. Summ. J. at 11-13. Orio counters that DGS's conduct regarding Orio's lifting restrictions, such as demanding that she carried the vacuum on her back after she supplied a doctor's certificate, creates triable issues of fact for Title VII disability discrimination based on a hostile work environment. Opp'n at 11, ECF No. 29 (citing Orio Dep. at 53, 61, 103, 123-24, 134-36, 165-66).

At the hearing on the Motion, Orio clarified that she is pursuing a discrimination claim as it pertains to a hostile work environment, and not a claim for failure to accommodate. Therefore, the court will only analyze the claim as it pertains to a hostile work environment. Transcripts ("Tr.") at 103-106 (Mot. Summ. J. Hr'g, May 4, 2016).

The Ninth Circuit Court of Appeals has not ruled on whether a hostile work environment claim may proceed under the ADA.[17] Other Circuit courts, and at least one district court within the Ninth Circuit, that have recognized a hostile work environment claim under the ADA have required the plaintiff to demonstrate that:

> (1) [She] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive

---

[17] *See Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003) (Ninth Circuit declined to rule on whether a plaintiff can bring a claim for hostile work environment or harassment under the ADA); *see also Meirhofer v. Smith's Food & Drug Centers Inc.*, 415 F. App'x 806, 807 (9th Cir. 2011) (unpublished decision in which the Ninth Circuit "assum[ed], arguendo, that hostile work environment claims are cognizable under the ADA.").

working environment; and (5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action.

*Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999) (citations omitted); *see also Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1185 (E.D. Cal. 2013) (using the standard applied by *Walton* in a Title VII hostile work environment claim under the ADA).[18]

### 1. Qualified individual with a disability subject to unwelcome harassment.[19]

DGS mentions in passing that it "disputes Orio meets the test of being 'disabled,' or that she was subject to unwelcome conduct. However, for the purposes of summary judgment, DGS addresses other prongs of the test herein." Reply at 9 n.5, ECF No. 26. The court concludes that DGS has intentionally waived their right to challenge these factors for purposes of this summary judgment motion, and will not conduct its own independent legal analysis. *See United States v. Demilia*, 771 F.3d 1051, 1055 (8th Cir. 2014) (citation omitted); *see also People v. McKinney*, 2016 Guam 3 ¶ 32 ("'It is not this Court's job to conduct legal research on [a party's] behalf, to guess as to [a party's] precise position, or to develop legal analysis that may lend support to that position.'") (alterations in original) (quoting *Griffith v. Butte Sch. Dist. No. 1*, 244 P.3d 321, 332 (Mont. 2010)).

### 2. Harassment was based on her disability or a request for an accommodation.

DGS maintains that Orio's disability discrimination claim fails because "none of the alleged harassing acts are related to her alleged disability." Mot. Summ. J. at 9, ECF No. 26. In

---

[18] The Fourth, Fifth, and Eighth Circuits recognize hostile work environment claims under the ADA with substantially similar elements to those set forth in *Walton*, 168 F.3d at 667. *See Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719–20 (8th Cir. 2003); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175 (4th Cir. 2001); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 233 (5th Cir. 2001).

[19] A "qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *see also Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (granting summary judgment where plaintiff was totally disabled, and unable to perform her job with or without reasonable accommodation). "A plaintiff bears the burden of demonstrating that she can perform the essential functions of her job with or without reasonable accommodation." *Kennedy*, 90 F.3d at 1481.

29

her deposition, Orio stated that the basis for the disability discrimination claim was the same as her sex, race, and nationality claims, such as hitting her with a pillow, and adding the allegation that Cruz called her a "snitch" and "mamasan." *See* Orio Dep. at 132-34. Orio's Opposition clarifies that the disability discrimination claim is focused on conduct regarding Orio's lifting restrictions, such as demanding that she carried the vacuum on her back after she supplied a doctor's certificate. Opp'n at 11, ECF No. 29 (citing Orio Dep. at 53, 61, 103, 123-24, 134-36, 165-66).

As discussed *supra* at note 11, this court is not persuaded that the scope of Orio's ADA claim is limited to the three specific events she testified to during her deposition. *See* Reply at 4, ECF No. 33. Viewed in context, Orio was confused regarding the legal application of her individual Title VII claims to the particular incidents. *See* Orio Dep. at 132; *see also Yeager*, 693 F.3d at 1080 (citation omitted).

### 3. Harassment sufficiently severe or pervasive to alter the conditions of Orio's employment that creates an abusive working environment.

As discussed above, to determine whether the alleged harassment was sufficiently severe or pervasive to be actionable in a hostile work environment claim, the court should consider "all the circumstances." *Clark Cnty. Sch. Dist*, 532 U.S. at 270–71, (2001) (citation and internal quotation marks omitted) (defining harassment under Title VII).

Like a hostile work environment claim based on sex, race, or nationality, a sufficiently severe or pervasive hostile work environment based on disability presents a high bar. For example, in *Vollmert v. Wisconsin Department of Transportation*, summary judgment was proper on a hostile work environment claim related to plaintiff's dyslexia and learning disability where she was "berated and criticized . . . for her problems stemming from her disability," such as when a coworker became frustrated with her when she had continued difficulties with a new system, when he warned another employee not to "be a Jane" when she made a stupid mistake,

30

and when he criticized the plaintiff for asking repetitive questions." 197 F.3d 293, 294, 297 (7th Cir. 1999). The Seventh Circuit reasoned that the conduct fell "well below the requirement of a hostile environment, in that it is neither severe nor pervasive." *Id.*

Yet in *Root v. Umatilla County*, a plaintiff who suffered from a back injury and was diagnosed with "lumbosacral sacroiliac spondylosis, herniated disc, and degenerative disc disease" avoided summary judgment. 526 F. Supp. 2d 1164, 1175 (D. Or. 2007). She had a permanent condition that limited her "activities such as standing, lifting, walking, as well as driving." *Id.* (citation omitted).[20] Additionally, "for at least five months, she was unable to get in and out of the bathtub unassisted, had difficulty sleeping, and suffered from bladder incontinence two to three times a week." *Id.* The District Court declined to grant summary judgment, finding there was a question of fact regarding whether she was a qualified individual with disability, and whether there was a hostile work environment when her requests for leave to go to physical therapy were not timely returned, and in some cases not returned at all, she was yelled at, she was not permitted to participate in staff meetings via telephone, coworkers were told not to share information about meetings with her if she could not attend, there were talks of "find[ing] a way to get rid of plaintiff, plaintiff was required to drive a substantial distance five days a week, her doctor's recommendation was not considered, and she was told she "could go look for another job." *Id.* at 1176-77 (citations omitted). "Viewing the evidence in a light most favorable to plaintiff, there [was] at least a question of fact whether plaintiff suffered conduct

---

[20] A qualifying "impairment must substantially limit a major life activity." *Rood*, 526 F. Supp. At 1174 (citing *Toyota Motor Mfg. Kentucky, Inc. v. Williams,* 534 U.S. 184, 195–98 (2002)). Examples of "[m]ajor life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,'" as well as "'working.'" *Id.* (quoting 29 C.F.R. § 1630.2(i)). A person's "activity is 'substantially limited' when a person cannot perform the activity that an average person in the general population could perform or faces significant restrictions in the 'condition, manner, or duration under which the individual can . . . perform [the] activity.'" *Id.* (alterations in original) (quoting 29 C.F.R. § 1630.2(j)(1)(i)-(ii), (j)(2)).

unwelcome, abusive, and pervasive enough to create a hostile work environment" related to her disability. *See id.* at 1177.

In this case, the harassment Orio experienced was not enough to amount to a disability discrimination claim. Orio alleges that from April 12 until May 11, 2012, when she was on transitional duty, she was the only woman assigned lavatory duty, and was assigned vacuum duty more frequently. Compl. ¶ 20; ECF No. 1; Orio Dep. at 154-55. From April 15 to May 7, she was the only female assigned to lavatory duty more than twice, being assigned three times in that time period. *See* DGS Ex. O (Orio's Work Duties), ECF No. 27-3 at 14–45 ("Pauline" cleaned the lavatory on April 30, 2012 and again on May 7, 2012, and an "Alexis" cleaned the lavatory on May 7 as well.). Yet Orio was on "transitional duty," which limits the scope of duties that she may perform, but includes lavatory duty. Weber Aff. ¶ 21, ECF No. 27-1. This does not amount to discrimination.

Moreover, although Orio stated that "[k]nowing [her] physician had advised against carrying heavy loads and that I hated vacuuming, DGS assigned me more vacuuming duties, knowing that the heavy vacuum made this difficult and painful job [sic] for me," the vacuum at issue was within the weight limit prescribed by her physician. Orio Ex. 1 ¶ 38 (Orio Aff.), ECF No. 29-3. Weber weighed the vacuum used by Orio to clean the airplanes as part of her duties, and discovered that it weighed less than fifteen pounds. Weber Aff. ¶¶ 7, 19, ECF No. 27-1. Orio's Affidavit does not contradict Weber's assertion that the vacuum weigh less than the weight limit set forth by her physician. She merely states that she does "not know what the vacuum weighs, but it felt very heavy to [her] especially when it filled with dirt." *See* Orio Ex. 1 ¶ 39 (Orio Aff.), ECF No. 29-3. Thus, being required to use the vacuum in accordance with her job duties does not appear to violate her physician's instructions simply because she "hated vacuuming" and "it felt very heavy."

32

Likewise, Orio's allegation that DGS did not allow her to swap duties with other employees does not give rise to a claim for hostile work environment merely because she was dissatisfied with the manner in which she was accommodated. *See Wynes*, 936 F. Supp. 2d at 1186 (a plaintiff's dissatisfaction with how an employer accommodated her disability does not give rise to a claim for hostile work environment harassment). Furthermore, although plaintiff alleges this incident was "precedent setting," it occurred on a single occasion, and thus cannot be considered "pervasive." *See* Opp'n at 19, ECF No. 29 (Acknowledging "there is no disagreement [Cruz's] denial of a swap was a single instance.").

This is not a situation like *Root* in which Orio was repeatedly denied her physical therapy appointments and made to drive excessive distances. *See* 526 F. Supp. 2d at 1175-77. DGS merely required Orio to act within the scope of her job duties within the parameters of her physician's instructions. Therefore, Orio has not demonstrated sufficiently pervasive or severe harassment.

**4. Remedial action (vicarious liability).**

As discussed above, even if Orio had set forth an actionable claim for discrimination, Cruz was not Orio's supervisor merely because he had some limited discretion over her daily work. *See Vance.*, 133 S. Ct. at 2443 (citations omitted).

DGS took immediate corrective action against Cruz after it received Orio's November 2011 letter complaining of his behavior. Cruz was counseled to be careful how he speaks to subordinates. *See* Orio Ex. 5 (Counseling Form), ECF No. 29-7. The fact that Cruz was formally reprimanded with a conversation and a counseling form suggests that DGS took prompt effective remedial actions. Furthermore, even if Cruz's mandate that Orio not swap her duties occurred after her letter, there is no indication that this incident was reported to DGS management. Thus, even if Cruz's conduct was discriminatory, which this court has determined

33

is not the case, DGS took remedial action that alleviates it of liability for a Title VII claim for disability discrimination.

Accordingly, this court **GRANTS** the motion for summary judgment as it pertains to a disability hostile work environment claim.

### D. Retaliation.

DGS asserts that Orio's retaliation claim fails because there is no genuine dispute of material fact that DGS retaliated against her because there was not material change in terms of her employment, and because she has failed to show a "but-for" causal connection between the complained of discrimination and her termination. Mot. Summ. J. at 19-21, ECF No. 26, Reply at 12, ECF No. 23. In response, Orio maintains that being forced to vacuum, perform lavatory duties, being denied a duty swap with another employee, changing shifts, and being told to turn in her badge amount to actionable retaliation. Opp'n at 16-22, ECF No. 29.

As a preliminary matter, this court notes that Orio has asserted a "retaliation" claim under Title VII, but not a constructive discharge claim. *See* Compl. ¶ 2, ECF No. 1 ("This action is brought pursuant to Title VII . . . for employment discrimination retaliation and the Americans with Disabilities Act . . . ."). The closest reference to a claim for constructive discharge is within her Opposition, stating that "[a]lthough her request to give up all her day shifts was granted, this effectively resulted in a partial constructive discharge." Opp'n at 18, ECF No. 29. This passing reference does not satisfy pleading standards for a constructive discharge claim. Thus, the court will evaluate Orio's claim as a retaliation claim rather than a constructive discharge claim.[21]

---

[21] "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (quoting *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 1246 (Cal. 1994). If "a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." *Id.* at 930-31 (citing

34

In order to avoid summary judgment on Orio's retaliation claim, she must establish a *prima facie* case of retaliation by showing: "(1) that she was engaging in protected activity, (2) that she suffered an adverse employment decision, and (3) that there was a causal link between her activity and the employment decision." *Hashimoto v. Dalton*, 118 F.3d 671, 679 (9th Cir. 1997) (citing *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 755 (9th Cir.1997)).

### 1. Protected activity.

"Protected activity" includes opposing "any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). DGS does not dispute that Orio's November 2011 letter qualifies as a protected activity. *See* Mot. Summ. J. at 19, ECF No. 26.

### 2. Adverse employment decision.

Orio contends she suffered an adverse employment decision: (1) changing to nightshift to avoid Cruz; (2) being assigned less desirable duties; and (3) eventually being terminated. Only if a plaintiff makes a *prima facie* case for retaliation does the burden shift to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Manatt*, 339 F.3d at 800. If that burden is met, the burden shifts back to the plaintiff to produce evidence that the reason served merely a pretext for discriminatory motive. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

### a. Shift change.

In November 2011, Weber granted Orio's request to switch to the graveyard shift to avoid any further confrontation with Cruz. Orio Dep. at 60–61, 151–52. This change occurred at Orio's request, and thus cannot be considered an adverse employment decision for retaliation

---

*Thomas v. Douglas,* 877 F.2d 1428, 1434 (9th Cir.1989) (holding that constructive discharge requires aggravating factors, such as a continuous pattern of discriminatory treatment).

35

purposes. *See Johnson v. City of Murray*, 909 F. Supp. 2d 1265, 1287 (D. Utah 2012), *aff'd,* 544 F. App'x 801 (10th Cir. 2013) ("[A]ll evidence indicates that the night shift was created and enforced in response to Plaintiff's requests for an accommodation for no contact with [her coworker]. . . . Plaintiff has not shown that the City's reason for creating the night shift position [was] pretext.").

### b. Change in duties.

There is evidence that it was commonplace for employees, including Orio, to swap duties, but that after she gave Chaparro the letter complaining of discrimination, on at least one occasion she was not allowed to swap because Cruz "was mad" and stopped her. A reassignment of duties can constitute retaliatory discrimination where both the former and present duties fall within the same job description. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006). For example, in *Burlington*, the plaintiff was reassigned from track laborer, a more "arduous and dirtier" position than plaintiff's former "forklift operator" position. *Burlington N.*, 548 U.S. at 70–71 (citations omitted). The Supreme Court held that:

> Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee such as [plaintiff] from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found retaliatory work assignments to be a classic and widely recognized example of forbidden retaliation.

*Id.* at 70–71 (citations omitted). Unlike *Burlington*, however, there is no "reassignment" at issue in this case. Cabin/ramp agents have their individual cleaning assignments rotated for the purposes of avoiding injuries due to repetitive movements. *See* DGS Ex. F (Job Description), ECF No. 27-2 at 50. All of Orio's duties were within her job description, and she was simply rotated. Weber Decl. ¶ 21, ECF No 27-1 (Transitional duties at DGS "include[] security search, cleaning the aircraft cabin, lavatory, and galley, and warehouse and office duties.").

36

Even though Orio expresses contempt for lavatory cleaning, over a three week period (April 15 through May 7, 2012), she was only assigned that duty three times while other women performed the duty as well. *See* DGS Ex. O (Orio's Work Duties), ECF No. 27-3 at 14–45 ("Pauline" cleaned the lavatory on April 30, 2012 and again on May 7, 2012, and an "Alexis" cleaned the lavatory on May 7 as well.). Additionally, even though on May 6, 2012, Orio was assigned the task of examining the overhead bins of the plane with a mirror for two days in a row and denied "swapping" in early May of 2012, this is not sufficiently arduous for retaliation purposes. *See* Compl. ¶ 23, ECF No. 1; Orio Dep. at 129. Orio's "subjective preference" for different duties does not make the manner in which her duties were rotated "a materially adverse action." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008) (citation omitted) (noting that this standard is objective and declining to determine plaintiff's transfer to working as a sales associate in the infant department of Walmart from being a cashier at the Tire Lube Express Department was more arduous or less prestigious). Weber Decl. ¶ 21.

This is not a case like *Burlington*, where it was objectively offensive to be reassigned to a position with arduous and dirtier duties. *See* 548 U.S. at 70. If Orio had been permanently assigned to perform only lavatory duties, perhaps this case would be more analogous to *Burlington*. Under these facts, however, Orio was merely assigned tasks within her job description which were rotated that were objectively reasonable for a cabin/ramp agent to perform. Consequently, Orio's subjective disdain for her work assignments is insufficient to overcome summary judgment.

### c. Termination.

Orio suffered adverse employment actions as it relates to her phone call with Chaparro on May 11, 2012, and her eventual end of employment. Orio's testimony is that Chaparro told her to turn in her badge, with no discussion of either FMLA or personal leave options. Orio Dep. at

37

109. Although Weber names Orio's failure to turn her badge into DGS in person as a reason for termination, this fact is in dispute. *See* Weber Dec. ¶¶ 24-26, ECF No. 27-1.

Yet to survive summary judgment, Orio must demonstrate a causal link between her activity and the employment decision.

### 3. Causal link between her activity and the employment decision.

To prove a causal connection, there must be proof that the desire to retaliate was the but-for cause of the challenged employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). "[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (citations omitted). In *Villiarimo*, the Ninth Circuit held that "[a] nearly 18–month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation." *Id.* (citations omitted). Looking to other Circuits, the court noted that cases involving delays between four months and a year are generally too long. *Id.* (citing *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1009–10 (7th Cir.2000) (finding that a one-year interval between the protected expression and the employees termination was too long to support an inference of discrimination standing alone); *see also Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398–99 (7th Cir.1999) (four months too long); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir.1998) (eight months too long), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998) (five months too long); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four months too long).

In *Filipovic*, the court granted summary judgment in defendant's favor, likewise noting that "[a] substantial time lapse between the protected activity and the adverse employment action

38

'is counter-evidence of any causal connection.'" *Id.* (citing *Johnson v. Univ. of Wis.–Eau Claire*, 70 F.3d 469, 480 (7th Cir.1995)). Thus, the court was persuaded that the four month delay between plaintiff's filing charges with the EEOC and his termination failed to set forth a *prima facie* case of retaliation. *Id.*

This case is like *Filipovic* because there is a significant delay between her November 7, 2011 letter and Orio's May of 2012 termination. Although the parties' arguments focus on the letter, the court also notes that even Orio's December 22, 2011 EEOC Charge of Discrimination is also too remote in time from her termination to sustain a causal connection. *See* Compl. ¶ 16, ECF No. 1. Thus, this court concludes that Orio's claim for retaliation in violation of Title VII is without merit, and hereby **GRANTS** DGS's motion for summary judgment on this claim.

### E. Punitive Damages.

Orio seeks an award of punitive damages in accordance with the law and damages proven, up to $300,000.00. Compl. at 7, ECF No. 1. As this court has granted summary judgment as to all of Orio's claims, DGS's motion for summary judgment as it pertains to foreclosing the availability of punitive damages is now moot.

### IV. CONCLUSION

For the foregoing reasons, the court hereby **GRANTS** Defendant DGS's Motion for Summary Judgment as it pertains to (1) Orio's sex, race, and nationality discrimination claims, (2) her disability hostile work environment claim, and (3) her claim for retaliation in violation of Title VII. Furthermore, the court finds that DGS's motion for summary judgment as it relates to foreclosing the availability of punitive damages is now moot.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Sep 26, 2016**